### 30982. HARRIS v. THE STATE.

PER CURIAM.

Kenneth Allen Harris, the appellant, was indicted by the Grand Jury of DeKalb County for the murder of Mrs. Xara Catherine Ward occurring on October 2, 1974. (A second count of the indictment was severed on motion of the appellant's attorney and never considered by the jury.) In a trial by jury that lasted from March 10-13, 1975, the appellant was found guilty of murder on March 12, 1975, and after finding a statutory aggravating circumstance the jury recommended the death penalty. On March 13, 1975, he was sentenced to death. He is before this court on appeal and for mandatory review of the death penalty imposed.

I. Summary of the Evidence.

On the morning of October 2, 1974, Mrs. Xara Catherine Ward of Decatur, Georgia, entertained her regular Wednesday morning Bible study group.

Afterwards, the women went to lunch at a nearby shopping center and discussed the Harvest Sale then in progress at Rich's. The women finished lunch about 12:45 and went their separate ways. Approximately an hour later Mrs. Ward bought a coat at Rich's Department Store in the South DeKalb Mall. That was the last time anyone (except the appellant) saw her alive.

Her body was discovered around 3:00 a.m. the following morning in her parked car at the rear of the mall. She was lying across the front seat of her automobile with a black coat over her head. There were two bullet holes in the bloodstained coat.

It was medically determined that Mrs. Ward died as a result of two gunshot wounds to the head. The two projectiles were found during an autopsy and removed.

Approximately two weeks later, DeKalb police investigators, acting on information supplied by Mr. Terry Moreland, the appellant's brother-in-law, obtained a warrant for Kenneth Allen Harris. He was arrested on October 14 at the construction site where he was employed.

Moreland testified that Harris picked him up at his job on Whitehall Street in Atlanta about 3:50 p.m. on October 2, 1974. As they drove out Interstate 20 towards Rockdale County, appellant asked Moreland whether he would have "the guts to talk up and shoot someone in the head." When Moreland replied that he could not, appellant told him that he had shot a woman at the South DeKalb Mall. He showed Moreland the .32 caliber pistol he had used with two empty chambers. Then, as they drove past the mall, Harris pointed to Mrs. Ward's car in the parking lot. "There's the car," he told his brother-in-law. A few days later Moreland called the police.

The gun used by the appellant was later found buried near a creek bank in Rockdale County. An employee from the State Crime Laboratory determined that the two bullets taken from the body of Xara Ward were fired from Harris' revolver.

Immediately following the appellant's arrest on October 14, 1974, he was advised of his rights and indicated that he understood. He was again advised after

they got to police headquarters, and again indicated that he understood. He then made a statement to officers which was tape-recorded.

The tape was played in open court. At the beginning of the tape, Harris was asked whether he had any objections to the conversation being recorded. He stated that he did not. He then told the officers that he didn't know what made him do it, that it "was something I always wanted to do."

Harris continued telling officers how he had hated his former stepmother and how he wished he had killed her. He really wanted to kill someone who resembled his stepmother, he told them. So he bought a hunting knife and went out to South DeKalb Mall several times looking for a woman who reminded him of the hated stepmother. Women who bragged a lot and argued with their husbands particularly irritated him, he told police. He wanted to "just mutilate the hell out of them."

He spotted Mrs. Ward on the second floor of Rich's, he said, "talking like she owned the god damn world." He followed her to her car, where he pulled the gun on her and told her to do exactly as he said. Then, he said, he directed her to drive to the back of the mall and park near a tree. When she offered him money, he told her, "I don't want nothing you've got, except your life." Then he took the coat out of one of her shopping bags, covered her head with it, said "Bye Lady," and shot her.

Harris stated that he felt so good afterwards that he wanted to do it again but left when he saw a car coming. He was happy, he said, because "I had done . . . what I set out to do." He told the officers that he was glad they caught him because he would have done it again. He also told them that he was on medication at the time, but stated it had no effect on his decision. He said he would have done it if he had been "stone sober."

The defense presented three medical doctors and the appellant's brother-in-law, Terry Moreland.

Moreland testified that the appellant had had a recent tonsillectomy and was on medication at the time of the murder. He said that Harris appeared drunk after taking the medication—that he could not walk or speak normally, and that his reflexes were slow.

Dr. George Roach testified that he had performed a tonsillectomy on Harris on September 24. Following the surgery, he prescribed penicillin and Sedapap, an alcohol/barbiturate combination. An overdose of this medication could cause drunkenness and/or drowsiness, he testified.

Dr. Carl Smith, a psychiatrist at Central State Hospital testified that he observed the appellant over a period of 41 days. He concluded that Harris was suffering from a schizoid personality, but not from any delusional compulsion. In Dr. Smith's opinion, Harris could distinguish right from wrong.

Dr. Julius Ehik, psychiatrist, testified that he examined Harris on November 16, 1974, and again on November 23. In his opinion, Harris suffered from a "pronounced personality disorder" where he harbored hostility toward a certain type of female. He did not feel that he was psychotic, however. Dr. Ehik stated that a combination of alcohol and barbiturates could lessen an individual's controls but stated that appellant knew right from wrong and was not delusional.

## II. Enumerations of Error

1. In appellant's first enumeration he avers the trial court erred in its pre-sentence charge to the jury regarding imposition of the death penalty, thereby depriving appellant of due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States.

The thrust of the appellant's argument in support of this enumeration is that the pre-sentence instructions to the jury by the trial court were death-oriented. Specifically he complains that the judge should have told the jury that even if they found a statutory aggravating circumstance they did not have to impose the death penalty.

As we noted in *Eberheart v. State,* 232 Ga. 247 (206 SE2d 12) (1974) the statute (Ga. L. 1973, pp. 159, 163-165; Code Ann. § 27-2534.1 (c)) requires: "The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in

writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt." In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in § 27-2534.1 (b) is so found, the death penalty shall not be imposed.

The trial court complied with the statute and as we read his instruction at the beginning and at the end he instructed that they could return a life sentence and how it should read. Appellant's allegation that the instructions were death-oriented or slanted toward death is without merit. Likewise his allegation that the court erred in furnishing the jury multiple copies of his instruction pursuant to the statutory requirement that the instructions be given in charge and in writing to the jury for its deliberation. Multiple copies of the instructions could at most be considered as no more than a convenience to the jury because each juror must reach a verdict based on his own conscience.

2. In Enumeration 2 the appellant alleges the trial court erred in its charge to the jury on the consequences of a verdict of not guilty by reason of insanity, thereby denying the appellant due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States and the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States.

The appellant contends that the trial court erred in charging the jury in the language of Code Ann. § 27-1503 on the effect of a verdict of acquittal by reason of insanity in its entirety. As we said in *Graham v. State,* 236 Ga. 378, 384 (223 SE2d 803) (1976), "This issue has been decided adversely to appellant in *Hulsey v. State,* 233 Ga. 261, 262 (210 SE2d 797) (1974), which held that to charge the latter part of Code Ann. § 27-1503 'though inappropriate, does not amount to harmful error requiring a reversal of the judgment.' " Although we recognize that those cases involved life sentences and the sentence imposed on Harris was death, the instruction was on the issue of guilt or innocence and was no longer an issue at the sentence

determination stage of the proceedings. This enumeration is without merit.

3. Appellant's third enumeration alleges the trial court erred in failing to charge the jury on the burden of proof of an insanity defense, thereby denying the appellant due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States.

Where the charge of the court includes instruction as to insanity but places the burden of proof as to each essential element of the crime, including intent, upon the state beyond a reasonable doubt, it is not error for the court not to instruct the jury specifically, absent a request, as to any burden of proof regarding sanity. *Adams v. State*, 236 Ga. 468, 469 (224 SE2d 32) (1976). See also *State v. McNeill*, 234 Ga. 696 (217 SE2d 281) (1975).

Enumeration 3 is without merit.

4. In Enumeration 4 the appellant alleges the trial court erred in sentencing the appellant to death on the basis of a jury verdict which was improper as to form, thereby denying the appellant due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States.

As the appellant did in *Eberheart v. State*, 232 Ga. 247, supra, the appellant here complains that the jury verdict repeated the relevant portion of the presentence charge practically verbatim and found circumstances instead of facts. Our statement in *Eberheart* is equally applicable here. "We note that designation of a circumstance is something far different than the narration of facts that appellant urges is required. The statute requires designation of the circumstance or circumstances, an ultimate issue or issues. This the jury did. Neither can we find error by the jury in repeating the same wording given to them in the written charge. If the wording stated is what the jury found, and there is no contrary indication in the transcript of trial, they did not err in their finding."

We find no merit to Enumeration 4.

5. In Enumeration 5 the appellant alleges the trial court erred in allowing a tape recording to be played to the jury without a proper foundation having been laid,

thereby denying the appellant due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States, and in Enumeration 6 that the trial court erred in directing the court reporter to transcribe testimony from a recording after the trial instead of during the trial as the recording was heard by the jury.

The appellant relies on *Steve M. Solomon, Jr., Inc. v. Edgar,* 92 Ga. App. 207 (88 SE2d 167) (1955) which dealt with a dictaphone record in a civil suit wherein the Court of Appeals set out standards for the foundation required before a recorded device may be played to a jury. The seven elements that court recognized that must be established as the foundation are as follows: (1) It must be shown that the mechanical transcription device was capable of taking testimony. (2) It must be shown that the operator of the device was competent to operate it. (3) The authenticity and correctness of the recording must be established. (4) It must be shown that changes, additions, or deletions have not been made. (5) The manner of preservation of the record must be shown. (6) Speakers must be identified. (7) It must be shown that the testimony elicited was freely and voluntarily made, without any kind of duress.

Since 1955 when the *Solomon* case was decided, great advances have been made in the simplicity of operation of recording devices in both the recording and playback features as well as in the miniaturization of the equipment.

The appellant made no objection at the trial to the alleged absence of a proper foundation for the introduction of the tape recordings. His objections were on unrelated grounds. Prior to the playing of the tapes before the jury, the trial court conducted an in camera inspection listening to the recordings in the presence of counsel and specified the portions that could be played before the jury over the objections of appellant's counsel and in his own judicial discretion. There had previously been testimony as to the circumstances of the statement and the manner in which it was recorded. There was also testimony concerning a gap in the tape resulting from the officer's attempt to duplicate the tape.

We believe a proper foundation was laid for playing the tape after the careful editing of the trial court. Appellant does not aver that there was anything favorable to him in that portion of the tape constituting the "gap" and we are led to the conclusion that he was not harmed thereby.

The court reporter was "in camera" when the trial judge designated the portions that could be played before the court and recorded his instructions. Those instructions were apparently followed before the jury and the court reporter was therefore able to report from the tape the narration played before the jury just as well as a reporter might incorporate a document into the transcript from which portions had been ordered deleted by the trial judge such as the second count of the indictment. Although the appellant relies on *Owens v. State,* 233 Ga. 869 (214 SE2d 173) (1975) and *Tamplin v. State,* 235 Ga. 774 (221 SE2d 455) (1975), wherein the transcript was incomplete because of the omission of the voir dire examination of prospective jurors, this court was unable to consider the issue raised by Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). There is no issue that we are precluded from reviewing by the reporting method utilized here, especially since there is no contention the transcription is inaccurate, and, also, appellant has shown no resulting harm to him.

Enumerations 5 and 6 are without merit.

6. In Enumeration 7 the appellant alleges there is error in the fact that the court reporter did not take down and record the complete closing argument of the state notwithstanding the appellant's counsel's request to the court reporter to do so.

Code Ann. § 27-2401 provides in part: "On the trial of all felonies the presiding judge shall have the testimony taken down, and, when directed by the judge, the court reporter shall exactly and truly record, or take stenographic notes of, the testimony and proceedings in the case, except the argument of counsel."

In an affidavit attached as an exhibit to the appellant's brief the official court reporter stated as follows: "I was the Official Court Reporter for the trial of the case of State of Georgia v. Kenneth Allen Harris.

During the trial of the case, before closing arguments, I asked Mr. Sidney Emeson if he wished the closing arguments reported. He stated that he wished the closing arguments of the State reported.

"During Mr. Emeson's closing argument, as it was not being reported, I was allowed to remain in my office, working on other transcripts, waiting to be buzzed to come into the courtroom to report the State's final closing argument. I remained in my office the entire time, was never buzzed, and, thus, the final State's closing argument was not reported.

"I further state that Mr. Emeson was asked in his office, during a recess, whether he wished the closing arguments reported."

Thus, this request does not appear in the record. If counsel wants the final arguments recorded it is his duty to see that it is done inasmuch as it is not required by statute. In this case he was present in court where the court reporter's absence during the concluding argument was apparent, and there is no indication that he took any steps to have the reporter recalled to the courtroom. Counsel cannot sit by and permit some matter they could correct by timely action and later claim error. Our duty to review the record to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor (Code Ann. § 27-2537 (c) (1)) in no way relieves the counsel of diligence in behalf of his client. *Eberheart v. State*, 232 Ga. 247, 251 (206 SE2d 12) (1974).

Appellant relies on our insistence in *Ross v. State*, 233 Ga. 361 (211 SE2d 356) (1975) that the voir dire transcription be included in the record to enable us to examine the entire record of the proceedings in the trial court notwithstanding that a particular error may not be assigned by the appellant.

Our requirement for the transcript of the voir dire proceedings was based on a United States Supreme Court holding that appears to require that a transcript of the voir dire proceedings must be included in the record in cases where the death penalty is imposed.

"In Funicello v. New Jersey, 403 U. S. 948 (91 SC 2278, 29 LE2d 859) [1970], the petitioner sought

post-conviction relief from imposition of the death penalty based upon the Witherspoon issue and on the double sentencing standard involved in United States v. Jackson, 390 U. S. 510, supra. The New Jersey Supreme Court denied the requested relief because no transcript of the voir dire had been submitted either on the review or on direct appeal from the judgment of conviction and the testimony of the veniremen was never transcribed. In a memorandum opinion the United States Supreme Court reversed the judgment insofar as it imposed the death sentence and remanded for further proceedings, citing the Witherspoon, Boulden, Maxwell and Jackson cases." *Ross,* supra, p. 368.

The case sub judice contains the voir dire transcript and our examination reveals no violation of the Witherspoon rule.

One other consideration weighs against the appellant's position. If the district attorney in his rebuttal had made some statement the appellant's counsel considered to be prejudicial to his client's case, he has the responsibility of objecting so the objectionable matter and the trial judge's ruling thereon will be a matter of record. We also observe that the rebuttal is to rebut matter brought out in the argument by the appellant's counsel. Unless the state strayed into new matters, not argued by the defense, and there is no allegation that such was done, the remarks in rebuttal were induced by the argument of appellant's counsel. Code Ann. § 27-2201 specifies the order of argument.

7. In Enumeration 8, the appellant alleges the trial court erred in sentencing the appellant to death where the district attorney had directly commented on the failure of the appellant to testify, thereby depriving the appellant of due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States.

During the sentencing phase of the trial the district attorney as part of his argument stated: "Certainly, if this was a case where a couple of fellows were gambling and drunk and got mad, and one of them pulled a pistol and shot, you would not want to give him the death penalty. This man has no excuse. There is no one to speak for him, that this was good, or this was a mistake, or something

was wrong." No objection was made at the trial.

Appellant alleges this is a violation of Code Ann. § 38-415 embodying the constitutional right against self-incrimination which provides in part: "The failure of a defendant to testify shall create no presumption against him, and no comment shall be made because of such failure."

We cannot subscribe to appellant's position. We can deduce no logical interpretation of the prosecutor's comments that would be characterized as a comment on the failure of the appellant to testify.

Enumeration 8 is without merit.

8. In Enumeration 9 the appellant alleges the trial court erred in denying the appellant's motion for a mistrial based on the presence during a portion of the trial of the victim's widower at the state's counsel table.

After his testimony, Mr. Phillip Ward, Jr., the victim's husband, was permitted to sit at the prosecution's counsel table during the testimony of several other state's witnesses. During the trial, the appellant objected to the presence of the widower, moving for a mistrial out of the presence of the jury. The trial court overruled appellant's motion, but directed that the victim's husband not sit at the prosecution's table for the rest of the trial.

In *Nunnally v. State*, 235 Ga. 693, 699 (221 SE2d 547) (1975), the appellant objected to the fact that the widow of the deceased was permitted to sit at the prosecution's counsel table during the course of the trial. We there said: "The conduct of the trial of any case is necessarily controlled by the trial judge, who is vested with a wide discretion and in the exercise of which an appellate court should never interfere unless it is made to appear that wrong or oppression has resulted from its abuse. *Atlanta Newspapers v. Grimes,* 216 Ga. 74 (114 SE2d 421) (1960); *Walker v. State,* 132 Ga. App. 476 (208 SE2d 350) (1974)."

Mr. Ward was the first witness who testified. The district attorney announced who Mr. Ward was and asked that he be permitted to sit at counsel's table. The appellant and his counsel certainly knew who he was thereafter but waited until several witnesses had testified before moving for a mistrial. We find no abuse of discretion by the trial judge in denying the motion for

mistrial and granting the motion that Mr. Ward no longer sit at the counsel table the first time objection was made to Mr. Ward's presence. There is no evidence of any emotional display on the part of Mr. Ward which would have in any manner prejudiced the right to a fair trial. No improper conduct on his part was ever brought to the attention of the court.

This enumeration is without merit.

9. In Enumeration 10 the appellant alleges the trial court erred in refusing to grant the appellant's motion to quash the indictment.

Beginning with *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1973) and in each subsequent case involving a death sentence the constitutionality of the Georgia Death Penalty Statute (Ga. L. 1973, p. 159 et seq.; Code Ann. §§ 27-2534.1 and 27-2737) has been upheld by this court. Subsequent to the time the appellant's counsel submitted her brief the Supreme Court of the United States has upheld the constitutionality of the Georgia statute in cases involving murder. See Gregg v. Georgia, —U. S.— (96 SC 2909, 49 LE2d 859) (1976).

Although we hold this attack on the constitutionality of the statute to be without merit we will consider the appellant's contention that the aggravating circumstance found by the jury was unconstitutional in our review of the death sentence.

10. In Enumeration 11, the appellant alleges the trial court erred in denying the appellant's second amended motion for new trial which was based on the denial to the appellant of a fair trial due to extensive prejudicial pre-trial publicity.

The appellant contends that he was denied a fair trial because of prejudicial pre-trial publicity. The appellant did not make any motion for a continuance or change of venue at the trial because of unfavorable publicity but in a death case this matter must be considered pursuant to the court's duty to consider the punishment as well as any errors enumerated by way of appeal. Code Ann. § 27-2537.

"(c) With regard to the sentence, the court shall determine: (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and . . ." Code Ann. § 27-2537.

The measure of whether pre-trial publicity created an influence of passion, prejudice or other arbitrary factors on the death sentence invokes the same considerations that are utilized in evaluating the merits of a change of venue.

In the recent case of *Street v. State,* 237 Ga. 307 (1976), we have traced the development of due process standards based on United States appellate court decisions on state court convictions where pre-trial publicity was alleged to be prejudicial to the rights of the accused. We there concluded that under the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.

In this case the appellant cites instances of five veniremen who had read, heard of, or discussed the case who were not selected to serve on the jury. He cites six of the panel members who eventually served on the jury who indicated some knowledge of the case via the newspapers. No juror who served indicated he could not do so with an open mind or considered the appellant guilty. In fact, the appellant did not utilize all of his peremptory strikes. Although appellant has submitted copies of newspaper articles in the community, the jury was drawn from a county comprising almost half a million residents. Many of the exhibits submitted were from articles that appeared after the jury was chosen and sequestered. The exhibits indicate almost a four-month break in publicity between the bulk of the publicity and the trial.

Under the circumstances we do not believe that the appellant has established a violation of either of the due process standards for pre-trial publicity prejudice set forth in *Street,* supra, affecting either the trial on guilt or innocence or the sentence.

Enumeration 11 is without merit.

11. In Enumeration 12, the appellant alleges the trial court erred in denying appellant's amended motion for new trial.

Only one issue not covered by specific enumerations of error appears in appellant's amended motion for new

trial. That issue concerns the voluntariness of the appellant's pre-trial statement to the police which was taped and played for the jury. The tape was admitted and played for the jury after the trial judge determined that the statement was freely and voluntarily given at a Jackson-Denno hearing (Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908, 1 ALR3d 1206)). We find no abuse in his determination. Enumeration 12 is without merit.

12. In Enumeration 13 the appellant alleges that he was denied a fair trial due to the cumulative effect of all the errors enumerated in the enumeration of errors.

The court having found no merit to the other enumerations of error finds this enumeration without foundation or merit.

### III. Sentence Review

In our sentence review we have considered the aggravating circumstance found by the jury and the evidence concerning the crime introduced in court.

We have reviewed the sentence as required by Ga. L. 1973, p. 159 et seq. (Code Ann. § 27-2537 (c) (1-3)), as we did in Coley v. State, 231 Ga. 829 (204 SE2d 612) (1974) and in each subsequent case involving a death penalty under this statute. We conclude that the sentence of death imposed on Kenneth Allen Harris was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The jury found the following aggravating circumstance:

The murder was outrageously and wantonly vile, horrible, and inhuman in that it involved torture and depravity of the mind. Code Ann. § 27-2534.1 (b) (7).

The appellant attacks the constitutionality of this aggravating circumstance as so vague that, instead of serving as a limitation, it serves to open up the area of discretion.

The entire aggravating circumstance involved reads as follows:

"The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

This aggravating circumstance involves both the effect on the victim, viz., torture, or an aggravated battery; and the offender, viz., depravity of mind. As to both parties the test is that the acts (the offense) were outrageously or wantonly vile, horrible or inhuman.

Each of these terms used is clearly defined in ordinary dictionaries, Black's Law Dictionary, or Words and Phrases and is subject to understanding and application by a jury.

We recognize that there is a possibility of abuse of this statutory aggravating circumstance but we have been given the duty of determining "(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27-2534.1(b)." Code Ann. § 27-2537 (c) (2). This is a test separate and distinct from our duties specified in § 27-2537 (c) (1) and (3). Indeed, if the similar cases test was to be limited to similar statutory aggravating circumstances, we would be limiting application of the statute to some common statutory aggravating circumstance that would have to appear in each case affirmed.

Under our duty specified in Code Ann. § 27-2537 (c) (2) we have no intention of permitting this statutory aggravating circumstance to become a "catch all" for cases simply because no other statutory aggravating circumstance is raised by the evidence.

This court has affirmed death sentences, involving this statutory aggravating circumstance. The cases were:

(1) *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974), cert. den., 44 LW 3762, in which the defendant was found guilty of strangling two seven-year-old boys to death after committing rape (anal sodomy) upon them.

(2) *McCorquodale v. State,* 233 Ga. 369 (211 SE2d 577) (1974), cert. den. 49 LE2d 1218, in which the defendant beat, whipped, burned, bit and cut his bound victim, put salt on her wounds, and sexually abused her prior to murdering her by strangulation.

(3) *Banks v. State,* 237 Ga. 325 (1976) in which the defendant killed two non-offending defenseless persons in an execution-style killing by gunshot.

We believe that each of these cases establishes beyond any reasonable doubt a depravity of mind and either involved torture or an aggravated battery to the victim as illustrating the crimes were outrageously or wantonly vile, horrible or inhuman. Each of the cases is at the core and not the periphery, and we intend to restrict our approval of the death penalty under this statutory aggravating circumstance to those cases that lie at the core. See Florida's approach to a similar problem in State v. Dixon, 283 S2d 1, 10 (1973), cited with approval by the Supreme Court of the United States in Proffitt v. Florida, — U. S. — (96 SC 2960, 49 LE2d 913 (1976).

In this case the crime is described in the appellant's own words: The appellant followed Mrs. Ward (the victim) around the store (Rich's) and out to her car. He pulled a gun, forced Mrs. Ward into her car and made her drive around behind the mall and park in a deserted area in the back parking lot.

The appellant then sat in Mrs. Ward's car with her and talked to her, laughed at her and clowned around with her. Mrs. Ward, in desperation, tried to appease the appellant and offered him money. She pleaded with him and kept asking him, "What do you want?" Then, in the words of the appellant, Mrs. Ward begged him, "'You're going to hurt me, You're going to hurt me. I know you're going to hurt me.' I said, 'I might lady.' I said, 'I just might do that.' I said, 'I might shoot you. I might kill you.' I said, 'You don't know.' I says, 'I'm liable to do anything.' She said, 'You want my money, and you want to rape me,' and all this. I said, 'No lady, I don't want to rape you. I don't want your money. [Unintelligible] I don't want nothing you've got, except your life. That's all I want.' I said, 'That's the main thing I want is your life,' and then she really cracked up then."

The appellant then made Mrs. Ward lay her head down on the seat and the following conversation ensued: "Well, she just laid there, you know, and, 'Please don't do this,' and . . . and then just . . . I don't know, just . . . I reckon I'd do it, and you'd do it too; you know you're fixing to die, you know, or she thought she was, which she did, but, you know, just, 'Please don't do this,' you know. You just don't [Unintelligible] all this, and I just told her she better shut

up, lady. I said, 'I'm doing the talking.' "

Then, the last words that Mrs. Ward heard as told by the appellant: "I tore it open and got the blue coat out and I just laid it over her. And then I just said, 'Bye Lady,' and shot her, you know, and then I set there for a few minutes, waited a few minutes, shot her again."

The appellant then got out of Mrs. Ward's car and decided to go back and shoot Mrs. Ward a third time. "I wanted to go back, and shoot her again and then go back and shoot her again, and then again, and then again."

The appellant expressed his feeling about the killing as follows: "I was happy then, you know. Like I say, I'd done what I wanted to do, what I set out to do."

We believe the evidence supports the jury's finding of the statutory aggravating circumstance. And that it too lies at the core of the statutory aggravating circumstance.

We have compared the evidence and sentence in this case with similar cases all involving execution style murders contained in the appendix attached to this opinion. Kenneth Harris' sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur, except Ingram, J., who concurs in the judgment only, Hall, J., who concurs specially in the sentence for the reasons stated in his special concurrence in Banks v. State, 237 Ga. 325, and Gunter, J., who dissents.*

SUBMITTED APRIL 19, 1976 — DECIDED SEPTEMBER 28, 1976 — REHEARING DENIED OCTOBER 19, 1976.

*Sidney A. Emeson, Sallie Rich Jocoy,* for appellant.
*Richard Bell, District Attorney, Thomas O.' Duvall, Jr., Assistant District Attorney, Arthur K. Bolton, Attorney General, G. Stephen Parker, Assistant Attorney General,* for appellee.

APPENDIX.

Similar cases considered by the court: *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *McCorquodale v.*

*State,* 233 Ga. 369 (211 SE2d 577) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974) ; *Stack v. State,* 234 Ga. 19 (214 SE2d 514) (1975); *Owens v. State,* 233 Ga. 869 (214 SE2d 173) (1975); *Prevatte v. State,* 233 Ga. 929 (214 SE2d 365) (1975); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Chenault v. State,* 234 Ga. 216 (215 SE2d 223) (1975); *Mason v. State,* 236 Ga. 46 (222 SE2d 339) (1976); *Coleman v. State,* 237 Ga. 84 (226 SE2d 911) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Davis v. State,* 236 Ga. 804 (225 SE2d 241) (1976); *Stephens v. State,* 237 Ga. 259 (1976); *Isaacs v. State,* 237 Ga. 105 (226 SE2d 922) (1976); *Banks v. State,* 237 Ga. 325 (1976); *Dungee v. State,* 237 Ga. 218 (1976).

HILL, Justice, concurring.

The defendant raises the constitutionality of the seventh aggravating circumstance of our death penalty statute, Code Ann. § 27-2534.1 (b) (7).

In Gregg v. Georgia, — U. S. — (96 SC 2909, 49 LE2d 859), the Supreme Court upheld the validity of Georgia's seventh statutory aggravating circumstance against the challenge that its imprecision rendered our capital-sentencing system invalid under the Eighth and Fourteenth Amendments (see fn. 51).

There remains a question as to whether ground 7 might be so vague as to provide inadequate notice to the defendant. The statement of the question raises a question, which is: Where the crime (murder, in this case) is defined specifically, must·the aggravating circumstances relating to punishment be just as specifically defined so as to put a person on notice as to both the crime and the punishment which may be imposed?

Because, in my view, ground 7 of our statute provides adequate notice, I do not find it necessary to resolve the intervening question posed above.

As applicable to this case, ground 7 provides as follows: "The offense of murder [Code § 26-1101] . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The words "torture, depravity of mind, or an aggravated battery to the victim"

are reasonably specific (aggravated battery is defined in Code § 26-1305).

In my view, ground 7 would be sufficiently specific, insofar as the requirement of notice is concerned, if it provided only that the offense of murder involved torture, depravity of mind, or an aggravated battery to the victim. The addition of the adjective phrase ("outrageously or wantonly vile, horrible or inhuman") modifying the offense of murder operates in favor of the defendant and does not, in my view, render ground 7 unconstitutionally vague as failing to provide adequate notice of the sentence which may be imposed.

The legal question raised here is different from that raised in *Arnold v. State,* 236 Ga. 534 (7) (224 SE2d 386) (1976), and the facts presented here are different from those presented in *Banks v. State,* 237 Ga. 325, supra. I therefore concur in the opinion and judgment of the court.

INGRAM, Justice, concurring specially.

I join the view expressed by Justice Hill in his concurring opinion but do not agree with all that is said in the opinion of the court. Therefore, I concur in only the majority judgment rendered in the case.